RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0155p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

CHRISTOPHER HALL,

       *Petitioner-Appellee,*

    *v.*

DOUG VASBINDER, Warden,

       *Respondent-Appellant.*

No. 08-1475

>

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 04-73548—Denise Page Hood, District Judge.

Argued: March 5, 2009

Decided and Filed: April 22, 2009

Before: SILER, COOK, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Debra M. Gagliardi, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. F. Randall Karfonta, Leland, Michigan, for Appellee. **ON BRIEF:** Debra M. Gagliardi, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellant. F. Randall Karfonta, Leland, Michigan, for Appellee.

_____

## OPINION

_____

McKEAGUE, Circuit Judge. Christopher Hall filed a petition for a writ of habeas corpus in connection with his state convictions. A Michigan jury convicted Hall of criminal sexual conduct against his daughter as well as obstruction of justice and conspiracy to obstruct justice. During the trial, both the prosecutor and defense counsel elicited testimony about Hall's silence during an earlier probate court proceeding and commented on Hall's silence during their respective closings. On habeas review, the district court concluded that the testimony and remarks of the prosecutor violated Hall's federal constitutional rights to

1

due process and against self-incrimination. Moreover, defense counsel's failure to object to the testimony and remarks constituted ineffective assistance of trial counsel. The district court conditionally granted habeas relief to Hall. The Warden, Doug Vasbinder, now appeals.

For the reasons set forth below, we reverse.

**I**

**A.     Hall's Trial**

The charges against Hall arose out of an incident that occurred in August 1998. Hall's daughter, who was then 12-years old, testified that at the time, she lived with her father and step-mother (Dondrea Hall) in Charlotte, Michigan. She said that around August 15th of that year, she took a weekend trip to her grandparents' house in Kalkaska, Michigan, with her father, step-mother, sister, and best friend. On Saturday of that weekend, she suffered a slight accident on an all-terrain vehicle, and that night, while Hall and the children were watching television, her father gave her a back rub. She testified that Hall, her sister, and her friend were in the room with her watching television, while her step-grandmother, Janet Hall (Hall's step-mother), and Dondrea were in the dining room, a short distance away.

Hall's daughter testified that at some point during the back rub, Hall started massaging her breast, and continued to squeeze and rub her breast for four or five minutes. She testified that her step-grandmother told Hall to leave her alone and go to bed. She said that her father appeared to be drunk at the time. She testified that the next morning, she told Dondrea what had happened, and that Dondrea in turn talked to Hall. They drove back to Charlotte that day, and Hall told his daughter that he was sorry, that he would make sure it never happened again, and that he would never again drink all day. She took this to mean that he was apologizing for drinking, not for fondling her. Janet, Dondrea, Art Hall (Chris's father), and his daughter's friend all testified at trial that they did not see Hall massage his daughter's breast. Hall also testified that he did not intentionally massage his daughter's breast.

In December 1998, the family again went to Kalkaska, and when they returned, Hall's daughter told her birth mother, who lived in Kansas, what had happened back in

August. Her mother instructed her to tell a school counselor, which she did. Subsequently, the daughter spoke to Det. Kellogg of the Michigan State Police and Marie Iott of the Family Independence Agency. The following day at school, while the daughter was waiting in a school office to talk with Iott again, Dondrea came in, said that the daughter had to leave for a doctor's appointment, and drove her home. Dondrea yelled at her and telephoned her father, who came home from work.

Hall's daughter, Dondrea, and Hall then drove to the office of Victoria Easterday, an attorney. The two adults waited in a conference room while the girl talked to Easterday privately about what had happened. When they returned to the conference room, Easterday informed Hall of the legal consequences if he were found guilty of criminal sexual conduct. Hall's daughter testified that Easterday told her that it would be a good idea for her to write a letter to Det. Kellogg to the effect that she made the whole thing up. She testified that she did not want her father to get into trouble and felt intimidated. She also said that later that evening at home, she wrote the letter as Dondrea watched her. Dondrea then took the letter and read it over the phone to Easterday. Afterward, Dondrea showed the letter to Hall. However, the daughter hid the letter under her mattress because she did not want it to be sent. Three drafts of the letter were admitted as an exhibit.

A hearing was held the next day in Eaton County Probate Court. Hall, Dondrea, and Hall's daughter all attended. Easterday represented Hall and a court-appointed attorney represented the girl. Det. Kellogg was the only witness who testified at the hearing. Following the hearing, Hall's daughter was temporarily placed in foster care and then permanently placed with her birth mother who lived in Kansas.[1] Hall was subsequently arrested on February 18, 1999.

---

[1] Hall's daughter had testified on cross examination that prior to the August 15th incident, she had told her dad on numerous occasions that she wanted to live in Kansas with her birth mother.

**B.    Matters Concerning the Probate Hearing**

During the trial, the subject of who had the opportunity to testify and who did, in fact, testify at the probate hearing came up on multiple occasions. Given the centrality of this topic to Hall's habeas claims, following is a detailed account of the arguments and testimony about who testified at the probate hearing.

The prosecutor noted during his opening statement that Hall's daughter was removed from Hall's home as a result of the probate hearing. The prosecutor did not refer to who did or did not testify at the hearing. Immediately after the prosecutor finished, defense counsel[2] gave an opening statement. Counsel made it clear that one of the main defense themes was going to be governmental overreach. Specifically, defense counsel stated near the end of his opening statement:

> [Hall] will testify that he was abruptly summoned to a [probate] court hearing. He went to a court hearing, and he was told, "The Court takes jurisdiction of not only your two children . . ." - - [the daughter], and her younger sister, . . . . Children of the mother in Kansas. - - ". . . but also takes jurisdiction of the child that you and Dondria have . . ." . . . ". . . and place them under the jurisdiction of the court, and they're going into foster care.", and that's exactly what happened. They went into foster care. Dondria Hall left Chris. Subsequently, she filed for divorce.
>
> What happens after that? He ends up filing a bankruptcy proceeding because he loses his house. Loses just about everything. And he would lose everything if it wasn't for this jury. And what caused that? Was that the child? Was it something that Chris did? Or, was it government? We contend it was government.

Trial Transcript ("TT") I 285-86.

Hall's daughter was the prosecution's first witness. On direct, the prosecutor asked her if there was a court hearing about putting the children into foster care, and she testified that there was such a hearing. The prosecutor did not ask her who testified during the hearing. On cross-examination, the following colloquy occurred between defense counsel and Hall's daughter:

---

[2]Hall had new counsel at the trial. Easterday was herself charged with conspiring to obstruct justice as a result of the letter writing episode.

Q    When you were there, did Dondrea s - - say anything to this
     person that put you in Foster care?

A    What do you mean?

Q    Did - - did she say anything from the witness stand, like this?  A
     chair, with -    -

A    No.

Q    - - a tape reco - - no?

A    No.

Q    Did your father?

A    Not that I - - not that I remember.

Q    So, you, and your younger sister, and your even younger sister
     were taken into foster care with no testimony.  No - - nothing
     spoken by you, or Dondrea, or your father.

A    I didn't say anything.  I don't remember if my dad did, or not.

TT II 56-57.  On redirect, the prosecutor asked her whether she had an attorney at the hearing (she did) and whether her father was present and represented by Easterday ("yes" to both).

Iott confirmed on direct that Easterday represented Hall at the probate hearing. She also testified that Hall's attorney had an opportunity to question any witness and to contest the proceedings.

Det. Kellogg testified for the prosecution after Iott.  During his direct testimony, the following colloquy took place:

Q    Did you, yourself, testify at this hearing?

A    I did.  I believe I was the only one who did testify after the
     petition was read into the record.

Q    Didn't Christopher Hall testify in that hearing about the custody
     of his daughter?

A    No.  He didn't.

Q    Did the parties have an opportunity for anybody else to testify
     that wanted to?

A     Yes. It wasn't done.

TT III 142. Defense counsel did not cross-examine Det. Kellogg.

Hall testified on his own behalf. On direct, his counsel asked him about the hearing. Hall testified that "It happened - - . . . - - fast. It was just shooo." TT III 258. Then, on cross-examination, the following exchange occurred between the prosecutor and Hall:

Q     . . . and I think we've heard [defense counsel] tell the jury that, basically, with almost no ifs, ands, or buts, the kids were just taken away from you. Why didn't you testify at that hearing, Mr. Hall?

A     It went quick. Everything was just - - there was a room full of attorneys, and a room not much bigger than that . . . jury box, and we were all crammed in there. And it was just bang, bang, bang. And I asked Vic [attorney Easterday] if I could say anything, and she said, "I'd recommend you didn't say nothin'."

Q     Oh. I see. So, it wasn't that you didn't have a chance. It wasn't that you couldn't talk. It wasn't that all this process went on without any opportunity for you. It's that you didn't and your lawyer told you not to. That's what happened, right?

A     She said, "I suggest you didn't."

Q     Okay. So you just . . . (Pause) . . . you just passed on your opportunity to have some input into that process. You could have.

A     I guess. Yeah.

Q     Well, I mean, come on, Mr. Hall. Your kids were bein' removed.

A     We didn't know that at that time. That was determined at the end of the hearing.

Q     Oh. So you just sat there like a bump on a log, and didn't even think about what the proceeding was involving?

A    We didn't know exactly what the proceeding was involving. . . .

TT III 289-90.  Hall's counsel did not object to any of this questioning.

In his closing argument to the jury, the prosecutor made the following statements regarding the probate hearing:

> See, this government action, this wasn't - - this didn't make anything permanent; all this did was a hearing to determine that there was some good reason to think that there [was] enough of a problem and these kids were at risk, to take them out, call timeout and look into it.  So again, as you start to think about this government intrusion in the untroubled family think about that, and probably most striking of all was the discovery for all of us that at that process that was portrayed as being so sinister and unfair the Defendant was there with his attorney, who sat there silent and made no objection and made no statement and offered no testimony at all, who stood there and what did he do?  Hid from the proceedings, he hid from the proceedings, he did not say a word while this was going on.  *He cowered in fear of discovery for what he had done and what he did that week to try to thwart this investigation.*  That's what happened that Friday; it was the *guilty man* in Court being whispered to by his lawyer saying don't get involved in this, they might find something out.  That's what you can conclude from that process where Detective Kellogg just explained what [Hall's daughter] told him and a decision was made, this is - - these kids are at risk right now, we've got to make some adjustments here until we can find out more.

TT IV 13-14 (emphasis added).  The prosecutor again alluded to Hall's silence later in his closing: "Detective Kellogg explains how he testified at the placement hearing.  The Defendant made no statement at the hearing, even though he could." TT IV 26.

Hall's counsel then addressed the subject of the probate hearing during his own closing argument.  He argued that Hall did not, in fact, have an opportunity to testify at the hearing:

> . . . Okay, all this stuff is going on, so what does one of the governmental representatives do, and that includes the referee over [at] the Eaton County Probate Court, they get up a quick hearing, give court-appointed lawyers to these people; Dondrea didn't even want the court-appointed lawyer, she called him "John something", put them in a small room, *there is no opportunity to testify* they let Detective Kellogg testify, Marie [Iott] testified.  The referee didn't say I want to hear the kid, I want to hear what's going on before issuing an order taking children away from their

parents. Then what happens? [Hall's daughter]'s gone, [her siblings are] gone; whoosh, out they go, and they've never come back to Chris at all. That very thing, the very thing that Dondrea said she was concerned about happened, the family was broken up. . . . The family's split, children gone, he lost his house, lost his family, he's in bankruptcy. What more could the state do?  Maybe they were acting under good intentions; the prosecutor would have you believe for all the best of intentions.  Look what happened to this man.

TT IV 79-80 (emphasis added).

During his rebuttal closing argument, the prosecutor returned to the issue of the probate hearing:

Counsel said, then, back to the government.  His words, I think, were "cobbled up a quick hearing, very little opportunity to testify".  I'd ask you this, how long does it take to prepare if all you're gonna do is go in there and tell the truth?  How big of a deal is it to go somewhere and answer a few questions if it's the truth?  It's not a big deal.  What's a big deal is if it's a lie and you've gotta cover all the bases and get to everybody and put something together.  That's why the Defendant didn't testify at that hearing that Friday because they hadn't been able to get Victoria [Easterday] up to get the grandparents handled and get all - - get everything nailed down yet.  He had to stay out of it because everybody didn't have their stories straight. *That was guilt working there and guilty knowledge*.  The truth is always the truth, it's the truth the minute you're asked; you don't have to get it straight, it is straight.

TT IV 114-15 (emphasis added).  Defense counsel did not object to any of the prosecutor's comments during closing.

After the prosecutor finished with his rebuttal, the trial court instructed the jury. As to what constitutes evidence, the court explained:

When you discuss the case and decide on your verdict you may only consider the evidence that has been properly admitted in the case. . . . Evidence includes only the sworn testimony of Witnesses and the Exhibit admitted into evidence.  Many things are not evidence and you must be careful not to consider them as such. . . .  The lawyers' statements and arguments are not evidence, they are only meant to help you understand the evidence and each side's legal theories. . . .  You should only accept things the lawyers say that are supported by the evidence or by your own common sense and general knowledge.

TT IV 126.

## C.  The Verdict and Direct Appeal

The jury found Hall guilty on all charges: one count of second degree criminal sexual conduct ("CSC"), MCL § 750.520b; one count of obstruction of justice, MCL § 750.505; and one count of conspiracy to obstruct justice, MCL §§ 750.505, 750.157(a). The trial court sentenced him to 96 to 180 months on the CSC count and 40 to 60 months on the obstruction and conspiracy counts, to run concurrently.

On direct review, the Michigan Court of Appeals, in an unpublished per curiam opinion, acknowledged that "[t]his case presented a credibility contest." *People v. Hall*, No. 228733, slip op. at 1 (Mich. Ct. App. Apr. 15, 2003). Hall raised several claims, including a claim that the prosecutor breached Hall's right to remain silent under the Fifth Amendment and engaged in other improper conduct, depriving him of a fair trial. As to the Fifth Amendment issue, the state court found that the prosecutor's remarks were improper:

> Viewed in context, we conclude that the testimony elicited by the prosecutor and the prosecutor's remarks at closing argument were improper.  The United States Constitution and Michigan's 1963 Constitution both provide individuals the right to remain silent to avoid being compelled to serve as a witness against themselves. US Const, Am V; Const 1963, art 1, §17.

*Id.* at 5.  However, because trial counsel had not objected, the state court reviewed the issue for plain error and found no such error "in light of the overwhelming evidence that was properly admitted from which the jury could find defendant guilty beyond a reasonable doubt." *Id*.

Hall also argued that his trial counsel provided ineffective assistance by, among other things, failing to object to the prosecutor's remarks about his silence at the earlier hearing.  The state court rejected the claim, explaining, "For the reasons previously discussed in this opinion, we conclude that defendant has not demonstrated that he was prejudiced by his trial counsel's performance and has not overcome the presumption that his trial counsel rendered effective assistance." *Id.* at 8.

The Michigan Supreme Court denied leave to appeal.

**D.        Petition for Habeas Relief**

Hall then sought relief in federal district court.  He filed a petition for writ of habeas corpus, raising the following issues:

> I. THE FIFTH AMENDMENT PRIVILEGE AGAINST SELF-INCRIMINATION WAS VIOLATED WHERE THE PROSECUTOR ELICITED EVIDENCE OF DEFENDANT'S SILENCE IN PRIOR PROBATE COURT PROCEEDINGS AND THEN ARGUED TO THE JURY THAT IN PROBATE COURT IT WAS "THE GUILTY MAN BEING WHISPERED TO BY HIS LAWYER" WHO DID NOT TESTIFY THERE. U.S. CONST. AMEND. V AND XIV.
>
> II. IRRELEVANT AND HIGHLY PREJUDICIAL EVIDENCE BECAME THEMES AND WERE THE REPEATED FOCUS OF THIS TRIAL WHERE THE IMPROPER EVIDENCE ENHANCED THE PROSECUTION AND DESTROYED DEFENDANT'S RIGHT TO A FAIR TRIAL. U.S. CONST. AMEND. V, VI AND XIV, MICH. CONST. 1963 ART. 1, §17, 20.
>
> III. WHERE THE PROSECUTOR EXTENSIVELY BERATED DEFENDANT'S CHARACTER BEFORE THE JURY WITH IMPERMISSIBLE EVIDENCE AND ARGUMENT TO THE JURY, A NEW TRIAL IS REQUIRED.
>
> IV. WHERE THE SENTENCING JUDGE FAILS TO RESOLVE OBJECTIONS TO THE SENTENCE INFORMATION REPORT (SIR) AND WHEN THE SENTENCE FOR CSC II AND OBSTRUCTION OF JUSTICE IS DISPROPORTIONATE TO THESE OFFENSES AND TO THE OFFENDER, THERE IS AN ABUSE OF SENTENCING DISCRETION REQUIRING RESENTENCING.
>
> V. DEFENSE COUNSEL'S FAILURE TO OBJECT TO IMPROPER EVIDENCE AND PROSECUTORIAL MISCONDUCT WAS CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL. U.S. CONST. AMEND. V, VI AND XIV.

The district court referred Hall's petition to a magistrate judge for report and recommendation.  The magistrate judge concluded that the prosecutor had violated Hall's Fifth Amendment right against self-incrimination and his due process right to a fair trial. *Hall v. Vasbinder*, 551 F. Supp. 2d 652, 672-76 (E.D. Mich. 2008).  The magistrate judge also concluded that Hall's trial counsel had provided ineffective

assistance for failing to object to the prosecutor's questions about Hall's earlier silence and comments made during closing. *Id.* at 668-72. The ineffective assistance served as cause for Hall's procedural default of his Fifth Amendment and due process claims, and the magistrate judge concluded that Hall was sufficiently prejudiced by the errors to excuse the default. The district court adopted the magistrate judge's report and recommendation over the Warden's objections and conditionally granted habeas relief to Hall. *Id.* at 660.

The Warden timely appealed.

## II

### A.     Standard of Review

We review de novo the district court's decision. *Murphy v. Ohio*, 551 F.3d 485, 493 (6th Cir. 2009). Under the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), a federal court can order habeas relief only if the state's adjudication of a claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In applying these standards, we examine the holdings of the Supreme Court as they existed at "the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). We can, however, look to decisions of other courts to determine whether a legal principle had been clearly established by the Supreme Court. *Smith v. Stegall*, 385 F.3d 993, 998 (6th Cir. 2004).

**B.        The Right Against Self Incrimination under the Fifth Amendment**

**1.        References to Hall's Pre-*Miranda* Silence**

The Supreme Court has drawn a distinction between a defendant's silence prior to any *Miranda* warnings and silence after such warnings. Hall was arrested months after the probate hearing. Thus, Hall's silence at the probate hearing amounted to pre-*Miranda* silence.

The Fifth Amendment guarantees "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." The Fifth Amendment's right to silence applies to a defendant in a state court proceeding under the Fourteenth Amendment. *Griffin v. California*, 380 U.S. 609, 615 (1965). In general, a defendant's decision to remain silent cannot be used as substantive evidence of guilt. *Id.* This rule clearly applies to a defendant's silence after the defendant actually invokes the right to remain silent. *See id.*; *cf. Doyle v. Ohio*, 426 U.S. 610, 619 (1976) (precluding the use for impeachment purposes of a defendant's post-*Miranda* silence). However, as a panel of this court recently observed, "The constitutionality of using a defendant's pre-*Miranda* silence as substantive evidence of guilt [has] not been addressed by the Supreme Court." *Jones v. Trombley*, No. 07-1419, 2009 WL 152312, at *2 (6th Cir. Jan. 22, 2009) (unpublished). The circuit courts have split on this issue. *See Combs v. Coyle*, 205 F.3d 269, 282-83 (6th Cir. 2000) (collecting cases). While this court has held that pre-*Miranda* silence cannot be used as substantive evidence of guilt, it did so under a pre-AEDPA, de novo standard of review. *See id*. at 283. It is, therefore, not controlling in this case, *Hereford v. Warren*, 536 F.3d 523, 532 (6th Cir. 2008); *Jones*, 2009 WL 152312, at *3 n.1, notwithstanding the district court's conclusion to the contrary, *Hall*, 551 F. Supp. 2d at 668-69.

Apart from substantive evidence, a defendant's pre-*Miranda* silence can be used to impeach his credibility as a witness. *Portuondo v. Agard*, 529 U.S. 61, 69 (2000) ("The prosecutor's comments in this case, by contrast, concerned respondent's *credibility as a witness*, and were therefore in accord with our longstanding rule that

when a defendant takes the stand, his credibility may be impeached and his testimony assailed like that of any other witness." (internal quotation marks omitted; emphasis in original)); *Jenkins v. Anderson*, 447 U.S. 231, 238 (1980) ("We conclude that the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility."). When a defendant chooses to testify at trial, he has opened his credibility to attack like any other witness. As the Supreme Court explained in *Raffel v. United States*, "We can discern nothing in the policy of the law against self-incrimination which would require the extension of immunity to any trial, or to any tribunal, other than that in which the defendant preserves it by refusing to testify." 271 U.S. 494, 499 (1926).

Moreover, a prosecutor can refer to a defendant's silence if doing so would be a fair reply to a defense theory or argument, for example, when defense counsel asserts that the government did not give his client an opportunity to tell his side of the story. *United States v. Robinson*, 485 U.S. 25, 34 (1988) (holding that the prosecutor can refer to the defendant's silence at trial when defense counsel argued that his client was precluded from telling his side of the story); *Lockett v. Ohio*, 438 U.S. 586, 595 (1978) (rejecting the Fifth Amendment claim of the defendant because her "own counsel had clearly focused the jury's attention on her silence, first, by outlining her contemplated defense in his opening statement and, second, by stating to the court and jury near the close of the case, that Lockett would be the 'next witness'"). "When the prosecutor goes no further than to take defense counsel up on an invitation, that conduct will not be regarded as impermissibly calculated to incite the passions of the jury." 2 Crim. Prac. Manual § 57:18 (2009) (citation omitted). This "invited reply" rule is limited, though, to the scope of the invitation. *Id.*

The Michigan Court of Appeals did not provide any analysis in support of its finding that the testimony elicited by the prosecutor and the prosecutor's remarks were improper, other than to note that both the Federal Constitution and the State of Michigan's Constitution provide an individual with the right to remain silent. *Hall*, slip op. at 5. To the extent that any of the testimony elicited by the prosecutor or the

prosecutor's remarks during closing arguments constituted impeachment or invited reply, the Michigan Court of Appeals' decision would be contrary to Supreme Court precedent on the scope of permissible uses of pretrial silence under the Federal Constitution. *Robinson*, 485 U.S. at 34; *Jenkins*, 447 U.S. at 238. If, however, the testimony or arguments went beyond these permissible uses and were used instead in a substantive way to prove Hall's guilt, then the state court's finding would not conflict with any then-existing Supreme Court precedent and would be in line with this court's holding in *Combs*.

It is difficult to see how Hall's silence could have been used to impeach his credibility as a witness. There are generally five types of impeachment evidence: self-contradiction; bias; character; capacity to observe, remember, or recount events; and specific contradiction. 1 McCormick on Evid. § 33 (6th ed. 2006 update). It seems clear that Hall's silence could not be used to show bias, impugn his character, or undercut his capacity. That leaves only self-contradiction and specific contradiction. The Warden argues that the prosecutor used Hall's silence only on cross-examination and not in the government's case-in-chief. Warden's Br. at 21. That is inaccurate. While Hall's defense counsel did argue during his opening statement that his client was a victim of governmental persecution and did first elicit testimony from Hall's daughter about whether her father or step-mother testified at the hearing, the prosecutor asked Det. Kellogg on direct examination whether Hall had testified at the probate hearing. "[A]nticipatory impeachment" of a witness is generally disfavored and, given the importance of the right against compelled self-testimony, it should be strictly circumscribed in the criminal context. *See United States v. Banks*, 29 F. App'x 276, 283 (6th Cir. 2002) (unpublished) ("Mr. Banks had not yet taken the stand when Agent Cannon testified, however, and the government's anticipatory impeachment theory seems to have no support in the caselaw."). This form of impeachment presents the defendant with the same dilemma as when an officer's testimony about the defendant's silence is used as substantive evidence of guilt.

Rather than impeachment of Hall as a witness, the testimony and arguments are better viewed as a reply to the defense theory of governmental persecution. When considering whether the prosecutor acted properly in replying to a defense theory, it is critical that we examine the prosecutor's questions and remarks in their context. *Robinson*, 485 U.S. at 33. As the Supreme Court explained in *United States v. Young*, "[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context . . . ." 470 U.S. 1, 11 (1985).

With regard to the probate hearing, defense counsel argued from the outset that the hearing was abruptly arranged and lacked certain features of due process (e.g., the victim did not testify or swear out a complaint). Defense counsel then went one step further and actually raised the issue of Hall's silence during the daughter's cross-examination. Importantly, it was defense counsel, *not the prosecutor*, who first broached the topic of whether Hall testified during the probate hearing. Defense counsel did so presumably to show that the probate court failed to hear any evidence from family members, but instead made its decision based solely on evidence from Det. Kellogg and the written petition, i.e., evidence from government sources. By doing so, however, he invited the prosecutor to explore whether Hall had received a fair hearing, including whether he had been given the opportunity to testify and whether he took advantage of that opportunity. In short, defense counsel opened the door on Hall's silence when he asked the daughter whether her father had testified at the hearing. The testimony about Hall's silence was not elicited by the prosecutor for an improper purpose, but rather in reply to the defense theory that Hall was the subject of governmental persecution throughout the investigation.

Beyond the witnesses' testimony about his silence, Hall also complains that the prosecutor treated his silence as substantive evidence of guilt during the prosecutor's closing statements. Viewed in isolation, the prosecutor's closing remarks are troubling. He described Hall as "cower[ing] in fear" during the probate hearing, as the "guilty man in [c]ourt," and as having "guilt working there and guilty knowledge." Again, though,

the question is not whether the prosecutor referred to Hall's motives for not testifying—the prosecutor clearly did. The question, instead, is whether the defense strategy somehow fairly invited the prosecutor to characterize Hall's motives in this manner.

Recall that during cross-examination of Hall's daughter, defense counsel first advanced the notion that custody of the children was stripped from Hall and his wife "with no testimony" from the daughter or any family member. Hall later testified that he did not understand exactly what was going on during the hearing, i.e., that he could be stripped of custody of his children. This theme of governmental overreach was extended during closing. Defense counsel argued to the jury that the probate hearing was hastily arranged, contended that there was no opportunity for family members to testify, and, most strikingly, strongly implied that the referee did not want to hear from Hall's daughter or any other family member about "what's going on" before taking the children from their parents. This defense theme fairly invited the prosecutor's comments during closing that Hall had not been denied the opportunity to testify, but instead had refused to testify because doing so would have undermined his plan to cover up the sexual conduct. By delving into the purported motives of the government actors, defense counsel left the door open for the prosecutor to respond by delving into Hall's own motives at the hearing.

With that said, the prosecutor arguably went beyond even that fairly wide opening by explicitly characterizing Hall's refusal to testify as evidence of "guilt." In general, "it is improper for a prosecuting attorney in a criminal case to state his personal opinion concerning the credibility of witnesses or the guilt of a defendant." *Byrd v. Collins*, 209 F.3d 486, 537 (6th Cir. 2000) (internal quotation marks omitted). In *Young*, the Supreme Court identified two dangers from a prosecutor's personal opinion about a defendant's guilt:

> [S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's

>    opinion carries with it the imprimatur of the Government and may induce
>    the jury to trust the Government's judgment rather than its own view of
>    the evidence.

470 U.S. at 18-19 (citing *Berger v. United States*, 295 U.S. 78, 88-89 (1935)).  In the present case, there is little danger that the jury believed that the prosecutor knew of evidence not presented to the jury because his remarks about "guilt" were not made in some general, free-standing statement, but rather in direct reference to the probate proceedings and why Hall did not testify at those proceedings.

As to the imprimatur of the government, this court has found less inflammatory remarks of prosecutors to have violated a defendant's right against self-incrimination or due process, although those remarks took place during trials where the defendant did not testify or did not otherwise initiate some discussion about his pretrial silence. *See, e.g.*, *Combs*, 205 F.3d at 279, 286 (holding that the prosecutor violated the defendant's right to remain silent by eliciting testimony that the defendant told police to "talk to my lawyer" and the prosecutor argued during closing that the statement was "evidence that he realizes the gravity of the situation and at this time gave that particular comment or response" to police; however, the defendant did not testify at trial); *Gravley v. Mills*, 87 F.3d 779, 787-88 (6th Cir. 1996) (in post-*Miranda* silence context, holding that repeated references by prosecutor to the defendant's pretrial silence were improper; however, prosecutor was the first to introduce testimony that the defendant had chosen to remain silent during a police interrogation).  Because the matter of harmless error/prejudice permits clearer resolution of this case, we presume without deciding that the prosecutor's specific remarks regarding guilt went beyond the scope invited by the defense strategy.

### 2.        Harmless Error Under *Brecht*

Improper remarks by a prosecutor about a defendant's right to remain silent do not constitute a structural error requiring automatic reversal. *Brecht v. Abrahamson*, 507 U.S. 619, 629, 638 (1993) (characterizing a violation of the right to silence as a trial error, rather than a structural one).  The Michigan Court of Appeals concluded that Hall was not prejudiced by the improper actions of the prosecutor "in light of the overwhelming evidence that was properly admitted from which the jury could find [Hall]

guilty beyond a reasonable doubt." *Hall*, slip op. at 5 (citing *People v. Graves*, 581 N.W.2d 229, 232 (Mich. 1998)). This is the familiar harmless-error standard of *Chapman v. California*, 386 U.S. 18 (1967) (*Graves* cites *People v. Anderson*, 521 N.W.2d 538, 545 (Mich. 1994), which explicitly relies upon *Chapman* for the harmless-error test). This was a legal determination of the state court, not a factual one as suggested by the Warden, and thus it does not enjoy AEDPA's strong presumption in favor of a state court's finding of historical fact. 28 U.S.C. § 2254(e)(1); *cf. Brecht*, 507 U.S. at 642.

In the normal course, the next step would be to consider whether, pursuant to *Brecht*, the prosecutor's actions "had a substantial and injurious effect or influence" on the jury's verdict. *Fry v. Pliler*, 127 S. Ct. 2321, 2328 (2007) (holding that the *Brecht* harmless-error standard, rather than the *Chapman* formulation, is applicable on federal habeas review). This would entail "a *de novo* examination of the trial record." *Brecht*, 507 U.S. at 642. However, as explained below, Hall has procedurally defaulted his Fifth Amendment claim. In order to excuse the default, Hall relies solely on the ineffective assistance of his trial counsel. The prejudice prong of the ineffective assistance analysis subsumes the *Brecht* harmless-error review. *Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (explaining that *Agurs*'s "materiality" standard, later adopted as the prejudice standard for ineffective assistance of counsel, is stricter vis-à-vis a habeas petitioner than is the *Brecht* harmless-error standard). If Hall can show that he was prejudiced by his attorney's failure to object during closing, then he necessarily satisfies *Brecht*; if, alternatively, Hall fails to establish that he was prejudiced, then we cannot excuse his default and it is immaterial whether he can otherwise satisfy *Brecht*.

### 3.     Procedural Default

Hall's trial counsel did not object during the prosecutor's closing or rebuttal. Michigan had a contemporaneous-objection rule at the time of Hall's trial. In keeping with that rule, the Michigan Court of Appeals treated the claim on direct appeal as waived and reviewed it only for plain error. Accordingly, his trial counsel's failure to object resulted in the procedural default of the Fifth Amendment claim. *Ege v. Yukins*,

485 F.3d 364, 378 (6th Cir. 2007); *Joseph v. Coyle*, 469 F.3d 441, 458-59 (6th Cir. 2006).

A defendant can overcome a procedural default by showing (a) cause for the default and (b) actual prejudice from it. *Murray v. Carrier*, 477 U.S. 478, 485 (1986). To show cause for the default, a petitioner must show more than mere error, he must establish a substantial reason to excuse the default. "The Supreme Court has acknowledged that 'cause' may be established through a showing of counsel's ineffectiveness in failing properly to preserve a claim for review in state court." *Ege*, 485 F.3d at 378 (citation omitted). An argument that ineffective assistance of counsel should excuse a procedural default is treated differently than a free-standing claim of ineffective assistance of counsel. *Id.* at 379-80 n.7; *Joseph*, 469 F.3d at 459. The latter must meet the higher AEDPA standard of review, while the former need not. *Joseph*, 469 F.3d at 459 ("Although Joseph must satisfy the AEDPA standard with respect to his independent IAC claim, he need not do so to claim ineffective assistance for the purpose of establishing cause.").

To establish ineffective assistance of counsel, it must be shown that counsel's performance was deficient and that the deficient performance prejudiced the defense so as to render the trial unfair and the result unreliable. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution." *Ege*, 485 F.3d at 378 (internal quotation marks omitted). The prejudice analysis for the procedural default and the prejudice analysis for the ineffective assistance of counsel argument are sufficiently similar to treat as the same in this context. "[E]stablishing *Strickland* prejudice likewise establishes prejudice for purposes of cause and prejudice." *Joseph*, 469 F.3d at 462-63 (citing *Mincey v. Head*, 206 F.3d 1106, 1147 n.86 (11th Cir. 2000); *Prou v. United States*, 199 F.3d 37, 49 (1st Cir. 1999)). To establish prejudice under *Strickland*, Hall "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

As explained above, much of what undergirds Hall's Fifth Amendment claim was not unconstitutional—all of the testimony about his silence during the probate hearing was proper as invited reply to the defense strategy. Defense counsel's strategy employed three complementary themes: Hall did not touch his daughter in a sexual manner; his daughter came up with the story so that she could live with her birth mother in Kansas; and the government rushed to judgment within a matter of days. These themes provided both an actual innocence component and a reason other than guilt for why the charges were brought against him. It is clear from his opening and closing statements that defense counsel wanted to generate sympathy for his client by showing that the government took his children away from him with just a couple of hours' notice. Hall was, it was alleged, essentially shell-shocked at the hearing. Although ultimately unsuccessful, defense counsel's strategy, including raising the matter of Hall's silence, was not constitutionally deficient.

No doubt, though, this defense strategy did carry risks. One risk was that the prosecutor would rebut the persecution theme with evidence that Hall had received a fair hearing before the probate court and had chosen not to testify for some reason other than lack of time to prepare, e.g., on the advice of counsel. Because Hall's silence was first raised by defense counsel, and because his silence fit within the defense's sound trial strategy, defense counsel was not ineffective for failing to object to the prosecutor's questions about Hall's silence.

With respect to the prosecutor's remarks at closing, defense counsel opened the door for the prosecutor to explore Hall's motives for not testifying. If the jury rejected the defense's theory that Hall did not testify because the hearing was rushed and the referee did not want to hear from family members, then it would have been logical for the jury to conclude that he did not testify for some other, less favorable reason. The prosecutor gave voice to that alternate interpretation. While the prosecutor may have

gone too far in doing so,**³** the strategy of the defense created the risk in the first place. In short, Hall employed a high risk/high reward trial strategy—any prejudice attributable to defense counsel's failure to object to the prosecutor's closing remarks has to be measured in comparison with this strategy.

Had defense counsel objected during the prosecutor's closing and rebuttal, counsel would have presumably requested that the trial court admonish the prosecutor and instruct the jury that arguments of counsel were not evidence. Shortly after the prosecutor finished his rebuttal closing, the trial court instructed the jury about what was and what was not evidence, thereby at least partially alleviating the lack of a contemporaneous instruction. Although a general instruction at the end of closing statements may not be sufficient to cure the full impact of a prosecutor's improper remarks in every case, *see, e.g.*, *United States v. Carter*, 236 F.3d 777, 787 (6th Cir, 2001) ("We believe that measures more substantial than a general instruction that 'objections or arguments made by lawyers are not evidence in the case' were needed to cure the prejudicial effect of the prosecutor's comments during closing arguments." (footnote omitted)), the instruction does lessen the impact of such remarks, as the jury is presumed to follow *all* of the court's instructions, *see United States v. Sivils*, 960 F.2d 587, 594 (6th Cir. 1992), not just the contemporaneous ones.

As to whether the evidence of guilt was overwhelming, the district court and state court came to differing conclusions. The district court correctly noted that the direct evidence of sexual misconduct came down largely to a matter of credibility—Hall's

---

**³**In applying the lower standard of *Brecht*, this court found that prosecutorial misconduct had a substantial influence on the jury. *Gravley*, 87 F.3d at 790. In doing so, it reasoned,

> Our courts have long recognized that a prosecutor has a strong influence over a jury. *See Berger*, 295 U.S. at 88, 55 S. Ct. at 633 (noting that "improper suggestions, insinuations, and, especially assertions of personal knowledge [by a prosecutor] are apt to carry much weight against the accused when they should properly carry none"). We have noted that this influence is even greater in cases involving sexual abuse because such cases "exert an almost irresistible pressure on the emotions of the bench and bar alike" due to the cases usually turning on the credibilities of the defendant and the prosecuting witness. *Martin* [*v. Parker*], 11 F.3d [613,] 616-17 [(6th Cir. 1993)]. As a result, in such instances a "strict adherence to the rules of evidence and appropriate prosecutorial conduct is required to ensure a fair trial." *Id.*

*Id.*

versus his daughter's. *Hall*, 551 F. Supp. 2d at 672. No other witness testified seeing Hall massage his daughter's breast. Yet, well before the prosecutor's closing remarks, Hall had explained that he did not testify at the probate hearing because his lawyer told him to remain silent. As explained above, this testimony was brought out on cross-examination and was well within the scope of the invited reply. This testimony was in some tension with the defense theory of a hasty hearing held by a referee who did not want to hear from family members. Thus, while Hall's credibility may have been damaged illegitimately by the prosecutor's closing remarks, it was also damaged legitimately by his own testimony that he remained silent on the advice of counsel.

Given all of this, we find that Hall was not prejudiced by defense counsel's failure to object to the prosecutor's closing remarks. This case is relatively rare in that a central component of the defense's theory was the defendant's silence at an earlier hearing. Unlike most cases, the testimony—the actual evidence that the jury was instructed to consider—about Hall's silence was entirely proper, either as directly prompted by the defense or fairly invited by it. Any prejudice to Hall by the prosecutor's remarks during closing was lessened by the trial court's subsequent instruction. Finally, if Hall's credibility suffered from the prosecutor's characterization of his motive for not testifying, it also suffered from his own explanation. While the prosecutor's remarks might have negatively impacted Hall's case, the magnitude of that impact, when evaluated against the properly admitted testimony about his earlier silence, was not enough to undermine confidence in the jury's verdict of guilt.

Accordingly, Hall cannot show that he was prejudiced by his counsel's failure to object to the prosecutor's closing statements. He defaulted his Fifth Amendment claim and that default is not excused by any ineffective assistance of counsel. Likewise, because his nested ineffective assistance of counsel claim fails, his independent claim necessarily fails under the stricter AEDPA standard of review. *See Joseph*, 469 F.3d at 459. We reverse the district court's conditional grant of habeas relief on Hall's Fifth Amendment claim and independent ineffective assistance of counsel claim.

**C.     Hall's Remaining Claims**

The district court also granted habeas relief to Hall on his prosecutorial misconduct claim.  In support of his claim, Hall asserts several instances of prosecutorial misconduct, including the testimony and the remarks of the prosecutor underlying his Fifth Amendment claim and several purported violations of state evidentiary rules.

In general, to merit habeas relief, the prosecutor's "conduct must be both improper and flagrant." *Broom v. Mitchell*, 441 F.3d 392, 412 (6th Cir. 2006) (citation omitted).  Hall's claim suffers from two fatal defects.  To the extent that any testimony and comments violated Michigan's rules of evidence, such errors are not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Williams v. Anderson*, 460 F.3d 789, 816 (6th Cir. 2006) (noting that cumulative trial error claims are noncognizable on habeas review).  The heart of his prosecutorial misconduct claim is identical to that of his Fifth Amendment claim.  As explained above, the testimony elicited by the prosecutor about Hall's silence was proper.  To the extent that the prosecutor made inappropriate comments at closing, these comments were not objected to and therefore suffer from the same procedural default deficiencies as does the Fifth Amendment claim.  Accordingly, for the same reasons that we find the Fifth Amendment claim defaulted, we find the prosecutorial misconduct claim defaulted.

Finally, Hall claims that he was denied his right to due process by the admission and exploitation of irrelevant and highly prejudicial evidence, and that certain irregularities occurred during sentencing.  For the reasons explained by the district court, the grounds for those claims are either non-cognizable on habeas review or without merit. *Hall*, 551 F. Supp. 2d at 676.

**III**

For the reasons set forth above, we **REVERSE** the district court's grant of conditional habeas relief.