# SUPREME COURT OF THE UNITED STATES

STACEY IAN HUMPHREYS, PETITIONER *v.*
SHAWN EMMONS, WARDEN

ON PETITION FOR WRIT OF CERTIORARI TO THE UNITED
STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 24–826.   Decided October 14, 2025

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE KAGAN and JUSTICE JACKSON join, dissenting from the denial of certiorari.

In 2007, a Georgia jury convicted Stacey Humphreys of murder and robbery, and sentenced him to death. It did so only after one of the jurors, during *voir dire*, misleadingly omitted critical details of her own experience as a victim of a similar crime and then bullied the other jurors into voting for death based on that prior experience. The extreme juror misconduct in this case illustrates the harms of an ironclad no-impeachment rule that prevents consideration of juror testimony to undermine a death verdict. Because our review of that question is buried in a procedural thicket that could be clarified by the Court of Appeals, I would at the very least vacate and remand for the Eleventh Circuit to supply the needed clarity on the important issues raised by this case. I therefore respectfully dissent from the denial of certiorari.

Humphreys was charged with murdering two women inside a construction company's model home, during which he forced both to undress and robbed them at gun point. The State of Georgia sought the death penalty. During *voir dire*, juror Chancey stated that she had previously been the victim of an attempted rape and robbery in her home, by a convicted murderer who had escaped from a mental institution. She swore under oath, however, that nothing

about that prior experience would prevent her from being a fair juror. She explained that her attacker never physically harmed her because she had escaped the building before he entered. She also swore that she would be able to "honestly consider" all three sentencing options: life with parole, life without parole, and death. App. to Pet. for Cert. 72a. As later revealed, these statements directly contradicted what she told other jurors during deliberations.

During the penalty phase deliberations, she disclosed to the other jurors that her attacker had in fact assaulted her while she was naked in her bed. In light of that experience, the jury foreperson later reported, Chancey "'had her mind made up'" from "'day one'" of trial that Humphreys "'deserve[d] to die.'" *Id.*, at 71a.

On the second day of deliberations, "even when the other eleven jurors . . . voted for life without parole" in an internal poll, "Chancey would not even consider it." *Id.*, at 71a–72a. At that point, the foreperson wrote a note to the trial court explaining that the jurors were "'unable to come to a *unanimous* decision on either death or life imprisonment without parole as a sentence.'" *Id.*, at 9a. Chancey, believing the note as written would result in a mistrial, revised the note to say that the jurors were "'*currently* unable to come to a unanimous decision.'" *Id.*, at 9a–10a. The court instructed the jury to continue deliberating.

Chancey then "snapped." *Humphreys* v. *Sellers*, No. 1:18–cv–02534 (ND Ga., Sept. 19, 2018), ECF Doc. 42–7, p. 443. She yelled, cursed, and screamed that she would "stay [t]here till forever if" that is what it took "for [Humphreys] to get death." App. to Pet. for Cert. 9a. She threw the victims' photos across the table and demanded, "'[D]o you want this to happen to someone you know?'" *Ibid.* She reminded the jurors of the similar details of her own attack, and told them that "'they had to reach a unanimous decision or [Humphreys] would be paroled,'" which was not true under Georgia law. *Ibid.* She then levied personal

attacks against the jurors and refused to engage in any debate.

Perhaps unsurprisingly, jury deliberations almost completely broke down. Screaming could be overheard from the courtroom. One juror "'took a swing'" at Chancey and punched a hole in the wall. *Ibid.* Jurors were seen crying on several occasions. A juror later recalled that "it was as if an evil force took over . . . Chancey." ECF Doc. 33–12, p. 13. The foreperson even wrote a note asking to be removed from the jury because of the "'hostile nature of one of the jurors.'" App. to Pet. for Cert. 12a. The court instead gave an *Allen* charge and instructed the jury to deliberate further. See *Allen* v. *United States*, 164 U. S. 492 (1896). It also rejected defense counsel's renewed motion for a mistrial. On the third morning of deliberations, the jury returned a unanimous verdict of death.

The above facts constitute a likely violation of Humphreys's Sixth Amendment right to an impartial jury. The problem for Humphreys is that these facts came to light largely through juror affidavits and juror testimony obtained after the trial. The Georgia courts held this evidence inadmissible under Georgia's no-impeachment rule, which generally prohibits the use of juror testimony to impeach a verdict, even in death penalty cases. See App. to Pet. for Cert. 325a (citing *Spencer* v. *State*, 260 Ga. 640, 643, 398 S. E. 2d 179, 184 (1990)). The no-impeachment rule, however, is not an absolute shield, and in extreme cases it must give way to constitutional guarantees.

A form of the no-impeachment rule is followed in every State and in the federal system, and it serves important purposes. The rule "gives stability and finality to verdicts" and "promotes full and vigorous discussion by providing jurors with considerable assurance that after being discharged they will not be summoned to recount their

deliberations." *Pena-Rodriguez* v. *Colorado*, 580 U. S. 206, 218 (2017).*

The rule, however, is not without limits. This Court has long recognized that the rule has exceptions in the "gravest and most important" cases. *McDonald* v. *Pless*, 238 U. S. 264, 268–269 (1915). Indeed, there "may be cases of juror bias so extreme that, almost by definition, the jury trial right has been abridged." *Warger* v. *Shauers*, 574 U. S. 40, 51, n. 3 (2014). "If and when such a case arises," courts should "consider whether the usual safeguards are or are not sufficient to protect the integrity of the process." *Ibid.* For example, one such exception to the no-impeachment rule is in an "egregious cas[e]" in which a "juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." *Pena-Rodriguez*, 580 U. S., at 225, 229. In those situations, "blatant racial prejudice . . . must be confronted . . . despite the general bar of the no-impeachment rule" because such prejudice is "antithetical to the functioning of the jury system." *Id.*, at 229.

This case illustrates another "extreme" situation in which the no-impeachment rule likely should have yielded because the juror's extreme misconduct threatened Humphreys's Sixth Amendment right to an impartial jury. *Warger*, 574 U. S., at 51, n. 3.

The "usual safeguards" were plainly insufficient "to protect the integrity of the process." *Ibid.* For instance, the "suitability of an individual for the responsibility of jury service" is typically "examined during *voir dire*." *Tanner* v. *United States*, 483 U. S. 107, 127 (1987). *Voir dire*,

─────────

*\**Pena-Rodriguez* involved Colorado's no-impeachment rule, which largely tracked the version of the rule set forth in Federal Rule of Evidence 606(b). See 580 U. S., at 218. Rule 606(b) is analogous in all relevant respects to Georgia's no-impeachment rule. See App. to Pet. for Cert. 36a. In any event, Georgia's interpretation of its own evidentiary rules cannot abridge an individual's federal constitutional rights.

however, cannot meaningfully screen out an individual like Chancey, who both misleadingly omitted crucial details about her prior assault when questioned and then undertook bad-faith tactics in the jury room by leveraging that experience to coerce her peers. Similarly, jurors' behavior is normally "observable by the court, by counsel, and by court personnel" during the trial, and jurors "may report inappropriate juror behavior to the court *before* they render a verdict." *Ibid.* Here, the trial court declined to investigate the possibility of inappropriate behavior despite hearing screaming and crying from the jurors and receiving the foreperson's note reporting the "'hostile nature of one of the jurors'" and requesting to be removed from the jury. App. to Pet. for Cert. 12a.

Importantly, Chancey's misconduct appears to have singlehandedly changed the verdict from life without parole to death. That places this case squarely among the "gravest and most important" cases in which the no-impeachment rule should yield to avoid "'violating the plainest principles of justice.'" *McDonald*, 238 U. S., at 269. Acknowledging an exception here is essential because there is a heightened "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion); see *California* v. *Ramos*, 463 U. S. 992, 998–999 (1983) ("The Court . . . has recognized that the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination"). "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner* v. *Florida*, 430 U. S. 349, 358 (1977) (plurality opinion).

The proper application of the no-impeachment rule to Humphreys's underlying juror-misconduct claim, however, is not directly presented in Humphreys's petition to this

Court. That is because, despite learning about Chancey's misconduct after the trial, Humphreys's lawyers failed to raise a juror-misconduct claim on direct appeal. New post-conviction counsel eventually raised the claim on state habeas review. The Supreme Court of Georgia held that the claim was thus procedurally defaulted and that the default was not excused by the ineffectiveness of Humphreys's appellate counsel on direct appeal. The court addressed the no-impeachment rule in the context of its ineffective-assistance-of-counsel analysis by holding that Humphreys was not prejudiced by his lawyers' failure to raise the claim because the underlying evidence was barred by the rule.

When Humphreys sought review of his juror-misconduct claim in federal court, his case took a further unexpected turn. Like the Supreme Court of Georgia, the Eleventh Circuit rejected the claim as procedurally defaulted. In so doing, the court seemingly deferred under the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA) to the state court's holding that Humphreys's default could not be excused by ineffective assistance of counsel. See App. to Pet. for Cert. 34a (suggesting that the standard of review for the juror-misconduct claim requires "apply[ing] AEDPA deference on top of *Strickland* [v. *Washington*, 466 U. S. 668 (1984)] deference"); *id.*, at 74a (Rosenbaum, J., concurring) (explaining that the panel's decision was required by a "faithfu[l] appl[ication of] AEDPA's standard of review").

By its terms, however, AEDPA deference applies only to a "claim that was adjudicated on the merits in State court proceedings." 28 U. S. C. §2254(d). AEDPA says nothing about the cause-and-prejudice inquiry that federal habeas courts undertake in deciding whether the state prisoner can "overcome the prohibition on reviewing procedurally defaulted claims." *Davila* v. *Davis*, 582 U. S. 521, 528 (2017); see *Coleman* v. *Thompson*, 501 U. S. 722, 750 (1991);

*Wainwright* v. *Sykes*, 433 U. S. 72, 90–91 (1977). Nor has this Court held that AEDPA deference applies when a federal court considers whether the ineffectiveness of counsel establishes "cause" to excuse the procedural default. In fact, most courts of appeals to consider the issue have found that such deference has no place in the federal cause-and-prejudice inquiry. See *Fischetti* v. *Johnson*, 384 F. 3d 140, 154–155 (CA3 2004); *Hall* v. *Vasbinder*, 563 F. 3d 222, 236–237 (CA6 2009); *Visciotti* v. *Martel*, 862 F. 3d 749, 769 (CA9 2016); but see *Richardson* v. *Lemke*, 745 F. 3d 258, 273 (CA7 2014).

Humphreys seeks review in this Court only on the issue whether the Eleventh Circuit correctly applied AEDPA deference to the cause-and-prejudice inquiry, not on the merits of the underlying juror-misconduct claim. In response, respondent does not contend that AEDPA deference should apply. Instead, he points to ambiguities in the Eleventh Circuit's opinion and argues that the Eleventh Circuit never applied AEDPA deference to the procedural-default question. See Brief in Opposition 13–16. Under these circumstances, the Court's reluctance to grant plenary review is understandable because the decision below may not be implicated by the question presented. Nevertheless, the court should vacate and remand and seek clarification from the Eleventh Circuit about the basis for its decision.

In a capital case with a potentially meritorious juror-misconduct claim, mere confusion about a lower court's reasoning does not justify closing the door to relief altogether. Nor is so harsh an outcome necessary here. Faced with a similarly "unclear" lower court opinion just last year, this Court remanded a capital case for further consideration, recognizing that the "ultimate assessment" of the petition would "depend on the basis for the Eleventh Circuit's decision." *Hamm* v. *Smith*, 604 U. S. 1, 2–3 (2024)

(*per curiam*). The Court should have done the same thing in this case.

Tragically, the Court denies review instead, allowing a death sentence tainted by a single juror's extraordinary misconduct to stand. Because it is at best "unclear" whether the Eleventh Circuit applied the correct standard of review in declining to adjudicate Humphreys's claim on the merits, I would vacate and remand the case for further clarification rather than leave Humphreys's juror-misconduct claim caught in a web of procedural barriers.

To avoid a similar result in future cases of extreme juror misconduct, courts considering such claims *ab initio* should carefully weigh the aims of the no-impeachment rule against the constitutional requirement to ensure the impartiality of a death-empaneled jury. Applying the no-impeachment rule too reflexively and restrictively risks a "systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right," *Pena-Rodriguez*, 580 U. S., at 225, and that is all the more imperative when the difference between life and death is at stake. I respectfully dissent from the denial of certiorari.