RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

KAYLA JEAN AYERS,

        *Petitioner-Appellant*,

    *v.*

OHIO DEPARTMENT OF REHABILITATION AND
CORRECTION, Director,

        *Respondent-Appellee*.

No. 23-3735

─────────────────

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:20-cv-01654—Sara E. Lioi, District Judge.

Argued: July 25, 2024

Decided and Filed: August 26, 2024

Before: MOORE, COLE, and MATHIS, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Brian C. Howe, THE OHIO INNOCENCE PROJECT, Cincinnati, Ohio, for
Appellant. Katherine Elizabeth Mullin, OFFICE OF THE OHIO ATTORNEY GENERAL,
Columbus, Ohio, for Appellee. **ON BRIEF:** Brian C. Howe, THE OHIO INNOCENCE
PROJECT, Cincinnati, Ohio, for Appellant. Katherine Elizabeth Mullin, OFFICE OF THE
OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────────

## OPINION

─────────────────

MATHIS, Circuit Judge. In 2012, an Ohio jury convicted Kayla Ayers of aggravated
arson and child endangerment in a case arising from a fire in Ayers's basement. In 2019, Ayers
obtained an expert report that suggests the prosecution's star expert witness, a fire inspector, was

not qualified to provide the testimony that helped convict Ayers.  Ayers petitioned the district court for a writ of habeas corpus, arguing that her trial counsel's failure to investigate the fire inspector's qualifications or retain an arson expert to challenge the inspector's testimony constituted ineffective assistance of counsel.  The district court dismissed the petition as time-barred, finding that Ayers failed to exercise due diligence to acquire her expert report sooner. *See* 28 U.S.C. § 2244(d)(1)(D).  Ayers appeals that decision, arguing that no amount of due diligence on her part would have revealed the expert evidence underpinning her ineffective-assistance claim sooner.  We reverse and remand.

## I.

Kayla Ayers and her three-year-old son lived in a house with Ayers's father, Jeff, and his family in Massillon, Ohio.  *See State v. Ayers*, No. 2013CA00034, 2013 WL 6506473, at *1 (Ohio Ct. App. Dec. 9, 2013).  Jeff resented Ayers for not contributing financially to his household, and he tried to kick Ayers and her son out of the house.  *Id.*  Ayers refused to leave, and she threatened that if Jeff ever moved out of the house, she would burn it down.  *Id.*

On October 3, 2012, Jeff decided to move out and told Ayers that he was leaving.  A few hours later, the Massillon Fire Department responded to a report of a fire at the residence.  Firefighters found a mattress ablaze in the house's basement and extinguished the flames.  Ayers and her son were the only people home at the time.  Ayers's neighbor, who saw Ayers and her son after they exited the house and provided aid until first responders arrived, said Ayers was "very upset" and repeatedly asking if she was going to lose custody of her children.

Ayers initially told investigators that her son accidentally started the fire.  "[Ayers] stated she was in the basement folding clothes when she noticed her son by the bed playing with a lighter."  *Id.*  Moments later, she noticed a fire on the bed and "grabbed a blanket and started fanning the flame."  *Id.*  She attempted to extinguish the fire with a glass of water but tripped, broke the glass, and cut her hand.  *Id.*  When the fire inspector, Reginald Winters, interviewed Ayers's son, he confirmed the toddler could ignite the lighter.  As investigators questioned Ayers further, she briefly changed her story, speculating that she might have started the fire by falling asleep while smoking a cigarette on the mattress.  She then changed her mind again, returning to

her original story.  Nevertheless, the police arrested Ayers and charged her with aggravated arson and child endangerment.

Winters prepared an expert report in support of the State's case against Ayers.  Citing a fire-inspection manual called NFPA 921, Winters's initial report opined that "some type of open flame" caused the fire and that he believed to a reasonable level of "scientific certainty" that a "deliberate act of a person" caused the fire.  R. 15-1, PageID 498.  The initial report, however, contained errors.  For instance, it made multiple references to an "[i]nsured" when it was not an insurance case, and it stated that the case involved "Chris Thomas," not Ayers.  *Id.*  Winters testified that these were typographical errors and attributed them to his failure to remove information from other reports that he used as templates.  Winters later compiled an "Executive Summary" that corrected those errors and restated the same opinion about the fire's cause, but incorrectly added that the fire started on the first floor, not the basement.  The final summary, which Winters read at trial, fixed the additional error and stated:

> After examination of the fire scene it was determined the fire originated in the basement on the bed.  After examination of the fire scene, interviewing witnesses, interviewing the insured and using the levels of scientific certainty as discussed in the 2011 edition of NFPA 921; A Guide for Fire and Explosion Investigation, it is my opinion the ignition source for the fire was some type of open flame.  The materials first ignited were blankets on the bed.  The act or omission that brought the ignition source and the materials first ignited together was the deliberate act of a person or persons.  Using these elements of a fire cause, the cause of the fire is incendiary.

R. 15-2, PageID 1224–25.

Winters also testified that the fire started on the northeast side of the mattress.  He claimed that the northeast side had a "heavier char pattern" than the other side and "calcination," which he explained occurs when a fire burns so hot that it turns metal springs white.  *Id.* at 1164.  Winters also opined that there was a second, distinct ignition on a wooden post on the bed's other side.  The prosecution relied heavily on Winters's testimony to argue that it is unlikely that a fire with two separate ignition points on the same bed happened accidentally.

Because Ayers was indigent, the public defender's office represented her.  Attorney Kristina Powers represented Ayers until about two weeks before her trial, when another public

defender, Matthew Kuhn, took over.  Neither attorney consulted an arson expert or independent fire inspector.  They also did not challenge the admissibility of Winters's testimony pre-trial.  And at trial, Ayers's attorney impeached Winters only on the inconsistencies between his initial report, the executive summary, and his testimony.  He never challenged Winters's qualifications to opine on the fire's cause.

The jury convicted Ayers.  The state court sentenced her to seven years' imprisonment and three years of post-release control.

Ayers has maintained her innocence.  She unsuccessfully challenged her conviction on direct appeal and later filed several motions in state court attempting to shorten her prison time, all of which were denied.  None of these challenges, however, attacked the substance or admissibility of Winters's testimony.  She also repeatedly attempted to obtain post-conviction counsel.  Her attempts bore fruit when the Ohio Innocence Project (OIP) accepted her case in 2019, shortly before Ayers's release date.

On July 29, 2019, while Ayers was still in prison, OIP secured an expert report from renowned fire-inspection expert John Lentini.  Lentini is one of the principal authors of NFPA 921, the manual that Winters relied on in formulating his opinions.  In his report, Lentini opined that "[t]here [was] no evidence that [two fires] were 'simultaneously burning'" and that "[t]he damage [was] indistinguishable from damage caused by normal fire spread from a single point of origin," undermining the State's theory that the fire had been started intentionally.  R. 15-1, PageID 507.  Lentini also questioned Winters's qualifications to testify about the fire's cause, stating that Winters's methods were "unreliable, unscientific, and at odds with generally accepted fire investigation methodology." *Id.* at 517.

Armed with Lentini's report, Ayers, with OIP as counsel, filed a habeas petition in the district court on July 27, 2020.  The petition raised four claims: ineffective assistance of counsel, prosecutorial misconduct, denial of due process, and actual innocence.  The district court found, among other things, that Ayers did not exercise due diligence to uncover the factual predicate of her claims in the six years between when she began her incarceration and when OIP took her

case.    Accordingly, the district court dismissed her claims as time-barred under 28 U.S.C. § 2244(d)(1)(D).

After the district court declined to grant a certificate of appealability, we granted Ayers a certificate of appealability on her ineffective-assistance claim.

## II.

We review de novo a district court's denial of a habeas petition.  *Daniel v. Burton*, 919 F.3d 976, 978 (6th Cir. 2019).  We likewise review de novo the dismissal of a habeas petition as untimely under 28 U.S.C. § 2244.  *Board v. Bradshaw*, 805 F.3d 769, 771 (6th Cir. 2015).  The district court's factual findings are reviewed for clear error.  *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005).

Although Ayers was released from prison in 2019 and completed post-release control in 2022, she continues to suffer collateral consequences for her felony arson conviction.  *See, e.g.*, Ohio Rev. Code Ann. § 2909.15(D)(2) (requiring arson offenders to register annually with the state "until the offender's death"); 18 U.S.C. § 922(g)(1) (prohibiting convicted felons from possessing firearms).  Habeas petitions filed by former prisoners who continue to suffer collateral consequences from their criminal convictions are justiciable.  *See Gentry v. Deuth*, 456 F.3d 687, 693–94 (6th Cir. 2006) (collecting cases).

## III.

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214, provides the statute of limitations for individuals serving a state sentence to apply for a writ of habeas corpus in federal court.  Specifically, a claim must be filed within one year of the latest of four possible triggering dates.  28 U.S.C. § 2244(d)(1).  Relevant here, the statute of limitations for a habeas petition begins to run from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2244(d)(1)(D).  To ascertain whether Ayers's habeas petition is timely under this provision, we must answer three questions.  *First*, what is the factual predicate of Ayers's habeas claim? *Second*, when could Ayers have discovered the factual predicate of her habeas claim through the

exercise of due diligence? And *third*, did Ayers file her habeas petition within one year of discovering the factual predicate of her claim?

**A.**

Congress did not define "factual predicate" as that term is used in § 2244(d)(1)(D). But courts generally agree that "a factual predicate consists only of the 'vital facts' underlying the claim." *Rivas v. Fischer*, 687 F.3d 514, 535 (2d Cir. 2012) (quoting *McAleese v. Brennan*, 483 F.3d 206, 214 (3d Cir. 2007)); *see also Smith v. Meko*, 709 F. App'x 341, 344 (6th Cir. 2017); *Cole v. Warden, Ga. State Prison*, 768 F.3d 1150, 1155 (11th Cir. 2014); *Mathena v. United States*, 577 F.3d 943, 946 (8th Cir. 2009); *Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000); *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998). A fact is "vital" if it is required for the habeas petition to overcome sua sponte dismissal. *Rivas*, 687 F.3d at 535; *see* Rule 4, Rules Governing Section 2254 Cases (requiring district courts to dismiss habeas petitions "[i]f it plainly appears from the petition and any attached exhibits that the petitioner is not entitled to relief"). To avoid sua sponte dismissal of an ineffective-assistance-of-counsel claim, the habeas petition must allege facts showing that: (1) counsel's performance was objectively deficient, and (2) the deficient performance prejudiced the petitioner. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

Ayers contends that Lentini's report establishes the factual predicate for her ineffective-assistance claim. Ayers asserts that her attorneys were deficient because they did not consult an arson expert and failed to challenge Winters's qualifications to testify as an expert. Failing to consult an arson expert in an arson case that centers on the fire's cause is arguably objectively deficient. *See id.*; *Richey v. Bradshaw*, 498 F.3d 344, 362–64 (6th Cir. 2007) (explaining that counsel did not exhibit the "most egregious type" of ineffective assistance of counsel "wherein lawyers altogether fail to hire an expert" but holding that counsel was nonetheless ineffective for failing to properly investigate the state's arson expert). And Lentini's report posits that Winters was not qualified to testify about the fire's cause and that his conclusion that the fire had two ignition points was not based on sound scientific methodology. Indeed, such evidence could have resulted in Ayers's acquittal.

Ohio Rule of Evidence 702 governs the admissibility of Winters's expert testimony. Like the corresponding federal rule, Ohio Rule 702 requires expert witnesses be "qualified . . . by specialized knowledge, skill, experience, training, or education" and base their testimony on "reliable scientific, technical, or other specialized information." Ohio R. Evid. 702(B), (C); *see Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993) (establishing that Federal Rule of Evidence 702 requires an expert's opinion to "rest[] on a reliable foundation"). Lentini's report claims that Winters was not qualified to give expert testimony because his testimony was "unreliable, unscientific, and at odds with generally accepted fire investigation methodology." Had Ayers's attorneys retained an arson expert to testify to this effect, they could have used that evidence to discredit Winters's testimony. The State relied heavily on Winters's testimony, so without it, there is a reasonable probability Ayers would have been acquitted. *See Strickland*, 466 U.S. at 694. Accordingly, Lentini's report provides the factual predicate for Ayers's claim because it provides facts supporting the claim's merits such that a court would not dismiss it sua sponte.

The State argues that the factual predicate for Ayers's claim is not Lentini's report itself, but the opinions expressed in the report. However, the State does not explain how Ayers could have discovered Lentini's expert opinions without him providing them in the report. In similar contexts, we have treated a witness's words and the document containing those words as the same. For instance, in *Souter*, the alleged factual predicate for the petitioner's habeas petition was the medical examiner's affidavit, and we determined the one-year limitations period would have commenced the day the affidavit was signed. 395 F.3d at 587. And in *In re Jackson*, the factual predicate was a witness declaration, and we found the limitations period began when the witness provided the declaration to the petitioner's counsel. 12 F.4th 604, 609 (6th Cir. 2021) (order). In those cases, the affidavit and the declaration served as the factual predicates, not the opinions and facts that led to their preparation.

The State cites *Stokes v. Leonard*, 36 F. App'x 801 (6th Cir. 2002), as an example of a petitioner failing to show that an expert report was needed to establish a factual predicate. That case does not help its cause. In *Stokes*, the petitioner's expert opined that his trial counsel was ineffective because he failed "to utilize readily available scientifically based data." *Id.* at 803.

Thus, the expert in *Stokes* did not provide a scientific opinion, but instead identified a body of available evidence that counsel failed to use. Because the data were publicly available and were useful without an expert's interpretation, the petitioner's claim did not rely on facts or opinions only an expert witness could have provided to him. *Id.* at 805.

Here, however, Lentini's report was not readily available, and Ayers could not have gleaned his opinions from another source.[1] When the *Stokes* court rejected the petitioner's contention that "he needed an expert to determine whether he needed an expert," it expressly declined to hold that "such a claim would never have merit." *Id.* It has merit here.

The district court clearly erred in finding that Lentini's report did not establish the factual predicate for Ayers's ineffective-assistance claim. We consider next when, through due diligence, Ayers could have discovered that report.

## B.

A habeas petitioner must exercise due diligence to discover the factual predicate of her habeas claim. 28 U.S.C. § 2244(d)(1)(D). To determine whether Ayers satisfied this requirement, we consider "when a duly diligent person in [her] circumstances would have discovered" the factual predicate for her ineffective-assistance claim. *DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir. 2006) (quoting *Wims v. United States*, 225 F.3d 186, 190 (2d Cir. 2000)). This "does not require the maximum feasible diligence, only 'due,' or reasonable, diligence." *Id.* (quotation omitted). Ayers bore the burden of proving that she exercised due diligence. *See id.* at 471.

During all relevant times, Ayers was an indigent prisoner. For such individuals, courts must account for the "reality of the prison system" when deciding whether due diligence would have unveiled the factual predicate of a habeas petition. *Easterwood v. Champion*, 213 F.3d

---

[1]Although the State attempts to conflate the investigation that Ayers's trial counsel should have done at the time of trial with the information that Ayers could have known about the State's expert, these are distinct inquiries. *See* Oral Argument at 19:14-20:08. Ayers, an indigent layperson, has different capabilities than her counsel. Indeed, that is one of the reasons criminal defendants are entitled to attorneys. Accordingly, we place different expectations on an individual's ability to uncover the factual predicate of a claim and an attorney's obligation to investigate and present a defense.

1321, 1323 (10th Cir. 2000); *DiCenzi*, 452 F.3d at 470–71; *cf. Jefferson v. United States*, 730 F.3d 537, 544 (6th Cir. 2013). That reality reveals that the expert report Ayers needed to make her claim was not in the prison library. No amount of diligent research through publicly available sources would have shown her that Winters was unqualified. She, a layperson, could not have known that Winters's analysis was not scientifically sound simply by hearing his testimony.

Further, Ayers was not entitled to counsel for her post-conviction proceedings. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987); *United States v. Augustin*, 16 F.4th 227, 233 (6th Cir. 2021); *State v. Crowder*, 573 N.E.2d 652, 653–54 (Ohio 1991). So she, as an indigent prisoner, had no means to acquire an expert witness and pay the associated fees. She could not have obtained Lentini's report without OIP's assistance. Uncovering the factual predicate of her claim before she had representation was infeasible.

Our decision in *Ege v. Yukins* illustrates the point. 485 F.3d 364 (6th Cir. 2007). In *Ege*, the petitioner argued that her state murder conviction rested on unreliable bite-mark testimony. *Id.* at 374. In support, she presented a letter from another county's prosecutor's office, which asserted that the state's bite-mark expert was a "charlatan" who should not be allowed to testify in criminal cases. *Id.* at 372–73. She found the letter by pure luck; a reporter leaked it to her attorney four years after her conviction. *Id.* at 372 n.3. Because no amount of due diligence would have uncovered the letter, we held that the statute of limitations on her due-process claim[2]

---

[2]The *Ege* petitioner also raised an ineffective-assistance claim, but unlike the due-process claim, we did not allow it to proceed. 485 F.3d at 373. This is because the letter from the state prosecutor's office stated only that that office "will not approve warrants where the main evidence as to the identity of a potential defendant is the opinion of [the state's expert] that [the potential defendant] is the source of the bite marks." *Id.* at 370 (quotation omitted). In other words, the letter stated that the state's expert was unreliable, but did not offer any scientific explanation for that conclusion. *Id.* at 370, 373. We found that "[t]he letter, which only points to the unreliability of [the state's expert], cannot logically constitute a 'factual predicate' for Ege's free-standing ineffective assistance claim" based on counsel's failure to object. *Id.* at 373. Because Ege should have known at the time of trial that the *manner* in which the state presented its physical evidence was objectionable, the letter was not the factual predicate for the claim. *Id.* Conversely, Ege could not have known that the *substance* of the state's expert's testimony was "complete bunk," and, because this aspect of the letter formed the basis of her due-process claim, we allowed that claim to proceed. *Id.* Here too, Ayers could have known that the *manner* in which the state presented Winters's testimony was flawed—and indeed, her trial counsel challenged Winters's testimony based on its internal inconsistencies—but Ayers could not have known that the *substance* of Winters's testimony was "complete bunk" without having consulted an expert of her own. *See id.* Because her ineffective-assistance claim is based on the latter, we treat it as similar to the due-process claim in *Ege*.

began to run on the day the reporter leaked the letter. *Id.* at 374–75. We also opined that while some flaws in the expert's testimony, like the lack of a proper foundation, could have been apparent from observing him at trial, "we [could not] say that it should have been similarly obvious . . . that the *substance* of the physical evidence—at least as presented by [the expert]—was complete bunk." *Id.* at 373.

Here, Ayers had no way of accessing the contents of Lentini's report until he produced it, just like the *Ege* prisoner could not have known about the letter until the reporter leaked it. *See id.* at 372 n.3. And as in *Ege*, where no amount of diligence by the petitioner would have revealed the prosecutor's letter, Ayers could not have obtained Lentini's, or any other expert's, opinions until OIP accepted her case and retained an expert. Additionally, like *Ege*, although Ayers may have been able to recognize counsel's errors like the failure to effectively cross-examine Winters, it would be unreasonable to expect an indigent layperson to recognize on her own that Winters's testimony was flawed. *See id.* at 373.

The State argues that Ayers was aware of the factual predicate of her ineffective-assistance claim long before Lentini produced his report in 2019 because her appellate counsel made an ineffective-assistance argument on direct appeal. But her attorney argued only that "she received ineffective assistance of trial counsel due to counsel's failure to cross-examine Inspector Winters with regard to the errors in his draft report and due to reliance on the draft report in preparation for trial." *Ayers*, 2013 WL 6506473, at *3. There was no mention of Winters's lack of qualifications, the substance of his testimony, or trial counsel's failure to consult an arson expert.

The State also argues that the record fails to show that Ayers exercised due diligence. Ayers did nothing, according to the State, "to pursue the matter until mid-2019." D. 12 at p.22. But Ayers's subjective diligence is irrelevant. The statute of limitations begins to run on the date the factual predicate "*could have* been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D) (emphasis added). The text of the statute suggests that the proper analysis is whether due diligence "could have" revealed the factual predicate if it was employed. This is an objective question that does not turn on the actions Ayers did or did not take. *Cf. In re Cantu*, 94 F.4th 462, 468–69 (5th Cir. 2024) ("[D]ue diligence is measured against an objective

standard, as opposed to the subjective diligence of the particular petitioner of record." (quotation omitted)).

This interpretation is consistent with our precedent. In *In re Jackson*, we granted a death-row inmate permission to file a second habeas petition because it was based on witness statements that could not have been discovered earlier through due diligence. 12 F.4th at 609. In reaching this decision, we did not consider any steps the petitioner took to discover the witness statements. We simply held that they "could not have been discovered earlier through the exercise of due diligence." *Id.*

Even if Ayers's subjective diligence were relevant, she could not have diligently pursued a claim she did not know she had. As explained above, Ayers could not have known the basis for her ineffective-assistance claim until an expert explained that Winters was unqualified to testify against her. The State argues that Ayers "clearly had notice of the facts" underlying her ineffective-assistance claim, *see* D. 12 at p.20, but we disagree. She could not have known that the substance of Winters's testimony was unreliable and unscientific unless a qualified expert revealed it to her, and that did not happen until Lentini produced his report.

**C.**

Finally, we consider whether Ayers filed her habeas petition within one year of the date she could have discovered the Lentini report. *See* 28 U.S.C. § 2244(d)(1)(D). She did. Lentini produced his report on July 29, 2019. Thus, Ayers "was aware of the vital facts for h[er] claim" no earlier than that date. *See Smith*, 708 F. App'x at 344. And within one year, on July 27, 2020, Ayers filed her habeas petition.

**IV.**

For the forgoing reasons, we **REVERSE** the district court's judgment and **REMAND** to the district court for further proceedings consistent with this opinion.